710 S.E.2d 482

**Terrance Robert HENDERSON, s/k/a Terrence Henderson**

v.

**COMMONWEALTH of Virginia.**

**Record No. 0688–10–4.**

Court of Appeals of Virginia,
Alexandria.

June 21, 2011.

Haley, J., filed a dissenting opinion.

Elizabeth Lauwaert Tuomey (Law Office of O. Keith Hallam, Jr., on briefs), for appellant.

Eugene Murphy, Senior Assistant Attorney General (Kenneth T. Cuccinelli, II, Attorney General, on brief), for appellee.

Present: HUMPHREYS, HALEY and ALSTON, JJ.

HUMPHREYS, Judge.

Terrance Robert Henderson ("Henderson") argues in this appeal that the Circuit Court of Arlington County ("circuit court") violated his due process right to confront the witnesses against him during a probation revocation hearing when it admitted Arlington Detective Rosa Ortiz's hearsay testimony

concerning other offenses, which either never resulted in charges against Henderson or were *nolle prosequied.*

## I. BACKGROUND

Henderson was convicted in the circuit court on January 26, 2001 of robbery, in violation of Code § 18.2–58, and was sentenced to twenty-five years imprisonment with all but six years and eight months suspended. Upon his release from incarceration, the circuit court ordered him to be placed on probation for five years or less if the circuit court or probation officer released him sooner. On September 14, 2009, Henderson was released from prison and began his probation.[1]

On October 14, 2009, Henderson's probation officer sent a letter to the circuit court noting that Henderson had been arrested and charged with robbery on October 8, 2009, in Arlington County, Virginia, setting forth the specific probation conditions that Henderson violated,[2] and recommending that the circuit court issue a bench warrant as a detainer and return Henderson to the circuit court for him to show cause as to why his probation should not be revoked. The probation officer's letter recommended that "the balance of the suspended sentence be imposed and the case be closed." The robbery charge referred to in this letter was later *nolle prosequied* prior to the revocation hearing.

On February 26, 2010, the circuit court held a probation revocation hearing. At the hearing, the Commonwealth added an additional allegation that Henderson was also in violation of the condition of his probation that he be of general good

---

**1.** The March 2, 2001 sentencing order provided for this sentence to run consecutively with all other sentences, which explains the difference between the sentence imposed by the circuit court and the actual time Henderson served.

**2.** The specific conditions that the probation officer's letter alleged Henderson violated are as follows:

Condition # 1: I will obey all Federal, State and local laws and Ordinances.

Condition # 2: I will report any arrest, including traffic tickets, within 3 days to the Probation and Parole Officer.

behavior to the previously alleged list of probation violations.[3] However, although a total of three conditions of probation were alleged to have been violated, the Commonwealth did not present any evidence regarding Henderson's alleged violation of Condition # 2, his alleged failure to report an arrest to his probation officer. Indeed, the only evidence offered in support of any of the alleged violations of the conditions of probation was the testimony of Detective Rosa Ortiz ("Ortiz") who testified regarding two alleged robberies that she had investigated in October 2009. No charges were brought against Henderson in connection with one of these robberies, and the other robbery charge was *nolle prosequied.* During the Commonwealth's questioning of Ortiz, Henderson's counsel objected to her testimony regarding what the witnesses in both cases told her.[4] The following colloquy took place regarding his objection:

> [Henderson's counsel]: Your Honor, at this point I'm going to object on hearsay. And I understand that hearsay is admissible in these types of proceedings, but I think we have—there is a qualifier to that case.
>
> I mean, I understand that the *Davis* case controls the hearsay question. However, in the *Davis* case the Court was referencing and admitting what they determined to be reliable hearsay, meaning hearsay from one government agent to another.
>
> To the extent that the detective's testimony is going to cover information not reported from another government agent, or reported from another government agent but from

---

**3.** We note that the probation officer was not called to testify regarding his allegations concerning Henderson's performance on probation, nor was the October 14, 2009 letter from the probation officer to the circuit court asserting that Henderson had violated two of the conditions of probation admitted into evidence at the probation revocation hearing.

**4.** On brief, Henderson also challenged Ortiz's testimony regarding recorded telephone conversations involving Henderson and a co-defendant, while they were incarcerated, with their family and friends. At oral argument, Henderson's counsel conceded that they were not challenging the testimony regarding the telephone calls, and thus we do not address them.

someone who was not a government agent, like one police officer interviews a victim and then the victim reports this crime, to the extent that we are getting into evidence that would be a victim's report of a crime, I think that that is the type of hearsay that should not be allowed in this type of proceeding.

*Secondly, if that hearsay is admitted, that violates his right of confrontation, which he is guaranteed in probation violation hearings.*

[Prosecutor]: *Two things, Judge. The right of confrontation only attaches at trial. We are post-trial in this case. We are at a revocation proceeding.*

Secondarily, I believe that the Court is in a good position to give the testimony that you are about to hear the appropriate weight that it's entitled to.

Certainly, to the extent that a victim or a person may report to a police officer is something that this Court can weigh and decide how much credibility should attach to that. So I would ask the Court to allow its admissibility and to weigh it appropriately.

The COURT: Overruled.

(Emphasis added).

Ortiz then proceeded to testify regarding the two alleged robberies. The first attempted robbery occurred on October 2, 2009, and Ortiz spoke with the alleged victim and his daughter by telephone on October 6, 2009. Ortiz testified that the victim informed her that he had received a phone call on his cell phone from an unknown number asking him to leave his apartment and to go to the courthouse to sign some legal documents regarding a family member. Upon leaving his apartment, a man approached the victim, and unsuccessfully tried to take the victim's bag, "a men's purse." The victim and his daughter advised Ortiz that they had discovered that the call to the victim was made from Henderson's cell phone and that they called Henderson and had him come to their house to talk with the victim regarding the incident. Henderson informed them that he lends his phone to a lot of

people, and he could not remember whom he had loaned it to that day. When Ortiz spoke with Henderson, he told her "basically the same thing," and later "that his phone was stolen and miraculously . . . appeared on his porch two days later." The victim then "explained to [Ortiz that] he really didn't want to file charges because people knew his daughter, and they all were in the neighborhood, they lived in the same neighborhood, they knew where he lived." Apparently, no charges were ever brought against Henderson in connection with this incident.

The second robbery Ortiz investigated was the October 8, 2009 home invasion robbery which was the basis for Henderson's October 8, 2009 arrest. This charge was later *nolle prosequied*. Ortiz testified that her supervisor called her "at night at her house" to come to the police station "to investigate a home invasion robbery." She went to the police station, and met with the victim on October 8, 2009. Ortiz testified that the victim informed her that three individuals came to his house, knocked on the front door, opened the unlocked front door after the victim ignored them because he looked and saw who they were, and then entered his home. Ortiz then testified that the victim identified one of the individuals as Henderson whom he had met a few weeks prior to the robbery at the probation office. After they entered his home, the victim explained to Ortiz that one of the other individuals was carrying a gun and displayed the firearm and that they stole some of his personal property. The victim then picked Henderson out of a photo lineup that Ortiz prepared.

Ortiz further testified that when she met with the victim and his mother, both ultimately refused to testify because they were scared of retaliation. The victim's mother informed Ortiz "she [had] heard gunshots around the house" the day before, "and that really scared her." Ortiz stated that she never found a gun in this case, but that she had heard one of the other individuals arrested in the second alleged robbery speaking with his girlfriend from jail during a recorded telephone conversation about a gun by reference in a safe. The

individual gave the girlfriend the code for the safe, and later said repeatedly that the girlfriend had the gun. Ortiz also testified that in the course of the recorded telephone conversations from jail she heard this other individual state that "they got me and they got Terrence."

After his arrest, Henderson informed Ortiz that people in the neighborhood "simply didn't like him, and that's why his name came up on these two different cases." Henderson also told Ortiz that "between 8:00 and midnight, the day of the incident, he was on his porch talking to people and there were other people on the porch." Ortiz also testified regarding a recorded telephone conversation that Henderson had with his mother while he was in jail. During that conversation, Henderson's mother informed him that the second victim's mother was asking for money in exchange for making the charges drop, but that she was not going to pay off the victim's mother. Henderson's mother also testified at the hearing, and reiterated that one of the girlfriends of the other individuals in the second alleged crime told her that the mother of the second victim was requesting money, but she was "not going to pay any money to her because [Henderson] didn't do anything." Henderson's mother also testified that on the night of October 8, 2009, Henderson was not out on the porch when she arrived home at 10:20 p.m., but that he was upstairs in his bedroom and he did not leave the house that night.

The hearing concluded, and the circuit court found that Henderson had violated the terms and conditions of his probation, revoked Henderson's probation, and reinstated his previously suspended sentence. This appeal followed.

## II. ANALYSIS

"The admissibility of evidence is within the discretion of the trial court, and we review its decision only for abuse of discretion." *Dickens v. Commonwealth,* 52 Va.App. 412, 417, 663 S.E.2d 548, 550 (2008) (citing *Blain v. Commonwealth,* 7 Va.App. 10, 16, 371 S.E.2d 838, 842 (1988)). "How-

ever, whether appellant's due process right of confrontation was violated is a question of law and is reviewed *de novo." Id.* (citing *Michels v. Commonwealth,* 47 Va.App. 461, 465, 624 S.E.2d 675, 678 (2006)).

## A. Waiver: Rule 5A:18

The Commonwealth contends that Henderson waived his right under Rule 5A:18 to claim a violation of his due process right to confrontation because he did not present this claim to the circuit court. At trial, Henderson's counsel objected to the admittance of the hearsay testimony stating "if the hearsay is admitted, that violates his right of confrontation, which he is guaranteed in probation violation hearings." The Commonwealth contends that Henderson's objection was based exclusively on the Sixth Amendment Confrontation Clause since the Commonwealth's response was that, "[t]he right of confrontation only attaches at trial. We are post-trial in this case. We are at a revocation proceeding." The basis for the Commonwealth's contention is that Henderson's counsel did not explain his objection after the Commonwealth's response, and thus the circuit court had no reason to know that the right to confrontation objection was based upon the Due Process Clause of the Fourteenth Amendment rather than the Sixth Amendment.

Rule 5A:18 provides, in pertinent part, that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." [5] Therefore, "in order to preserve an issue

---

5. Effective July 1, 2010, Rule 5A:18 was revised and now states, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling. . . ." Because the proceedings below were completed prior to this revision taking effect, we will rely on the language of Rule 5A:18 that was then in effect. *See Fails v. Va. State Bar,* 265 Va. 3, 5 n. 1, 574 S.E.2d 530, 531 n. 1 (2003) (applying the Rule of Court in effect at the time of the proceedings below).

for appeal, 'an objection must be timely made and the grounds stated with specificity.'" *Kovalaske v. Commonwealth,* 56 Va.App. 224, 229, 692 S.E.2d 641, 645 (2010) (quoting *McDuffie v. Commonwealth,* 49 Va.App. 170, 177, 638 S.E.2d 139, 142 (2006)). "[T]he main purpose of the rule is to ensure the trial court can 'consider the issue intelligently and take any corrective actions necessary to avoid unnecessary appeals, reversals and mistrials.'" *Id.* at 230, 692 S.E.2d at 645 (quoting *Martin v. Commonwealth,* 13 Va.App. 524, 530, 414 S.E.2d 401, 404 (1992)).

In this case, the issue was sufficiently preserved. The record establishes that the circuit court was aware of Henderson's objection to the admissibility of Ortiz's testimony based upon his right of confrontation as it applied in a probation revocation hearing. *See Caprino v. Commonwealth,* 53 Va.App. 181, 184, 670 S.E.2d 36, 37–38 (2008) ("'Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts.'" (quoting *Yarborough v. Commonwealth,* 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977))); *Groves v. Commonwealth,* 50 Va.App. 57, 61–62, 646 S.E.2d 28, 30 (2007) ("This means the 'judge is presumed to know the law and apply it correctly in each case.'" (quoting *Crest v. Commonwealth,* 40 Va.App. 165, 172 n. 3, 578 S.E.2d 88, 91 n. 3 (2003))).

The record further establishes that the circuit court knew the action that Henderson desired the circuit court to take and his legal basis for it. The circuit court had the opportunity to consider the issue intelligently, and to take any corrective action it deemed necessary. Contrary to the implication inherent in the Commonwealth's argument, Henderson's objection was sufficiently specific for the circuit court to understand the nature of his objection—that the evidence should not be admitted—and the grounds therefor—that it violated his constitutional right to confront that evidence as that right applied in a probation revocation hearing. The Commonwealth's response to Henderson's objection may well suggest that the prosecutor was unaware that a limited due process right of

confrontation exists in the context of a probation revocation hearing outside the parameters of Sixth Amendment trial rights. However, any theoretical lack of knowledge of the law on the part of the prosecutor cannot be imputed to the circuit court. Nor does a mistake of law on the part of counsel for the opposing party mandate a response or clarification by counsel for the objecting party as long as the original objection satisfies the requirements of Rule 5A:18 by putting the *court* on adequate notice of the nature and grounds of the objection. Moreover, contrary to the assertion of the Commonwealth that Henderson should have responded to the prosecutor's argument, the record reflects that he had no opportunity to do so since the circuit court ruled immediately after hearing the Commonwealth's response. Therefore, we reach the merits of the issue on appeal.

### B. Fourteenth Amendment Due Process Right to Confrontation

Henderson alleges that the circuit court violated his Fourteenth Amendment due process right to confrontation when it admitted Ortiz's hearsay testimony.[6]

---

6. The Commonwealth argues that Henderson's objection at trial was based solely upon the Sixth Amendment Confrontation Clause and that this objection was properly overruled because the Sixth Amendment does not apply at revocation hearings. "The Sixth Amendment right is limited to 'criminal prosecutions,' and a revocation hearing is not a 'criminal prosecution.'" *Dickens*, 52 Va.App. at 417 n. 1, 663 S.E.2d at 550 n. 1 (citing *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). However, Henderson did not below, and does not now, contend that the circuit court violated his Sixth Amendment right to confrontation. It is only the Commonwealth that has ever made that assertion. Rather, Henderson argued in the circuit court that Ortiz's testimony violated his right of confrontation as it applied in probation violation hearings, which, as discussed more fully below, can only be the more limited right of confrontation conferred by the Due Process Clause of the Fourteenth Amendment. Therefore, there is no merit to the Commonwealth's contention, and we do not address it further.

The Commonwealth also alleges that Henderson forfeited his right to confront the witnesses due to witness intimidation. However, there is no evidence in the record that the circuit court made a factual determination that any witnesses refused to testify at the revocation hearing

■ "[B]oth the United States Supreme Court and this Court have ... held that probation revocation hearings are not a stage of criminal prosecution and therefore a probationer is not entitled to the same due process protections afforded a defendant in a criminal prosecution." *Dickens,* 52 Va.App. at 417, 663 S.E.2d at 550 (citing *Davis v. Commonwealth,* 12 Va.App. 81, 84, 402 S.E.2d 684, 686 (1991)); *see also Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 1759–60, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2599–2600, 33 L.Ed.2d 484 (1972).[7] However,

---

and that such refusal was due to any intimidation by Henderson or his agents; nor is there any evidence in the record before us that would support such an implicit finding. Thus, we likewise do not address this contention on appeal.

7. Because probation revocation hearings are not criminal trials and also because *Morrissey* predates them, the United State Supreme Court's decision on the contours of the Sixth Amendment right to confrontation in *criminal trials, Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and its progeny are not directly implicated or discussed herein except as they apply to the definition of testimonial hearsay, and to facilitate an understanding of the history of the "reliability" test applied by some jurisdictions to due process confrontation issues. *See Harper v. Commonwealth,* 54 Va.App. 21, 27, 29, 675 S.E.2d 841, 844, 845 (2009) ("The *Crawford* opinion focuses on the necessity of replacing the [*Ohio v.*] *Roberts*[, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980),] standard with what the Court considers to be the original understanding of what the confrontation right *is*, that is, a procedural guarantee to the accused that he may challenge testimonial evidence against him through the process of cross-examination. The opinion does not contain a similar revision of the type of legal proceedings to which the Confrontation Clause applies.... 'The *Crawford* opinion does not state that its rule applies at sentencing; it does not refer to sentencing. While that rule may eventually be extended to the sentencing context, that has not happened yet.' " (quoting *United States v. Chau,* 426 F.3d 1318, 1323 (11th Cir.2005) (emphasis in original))); *State v. Rose,* 144 Idaho 762, 171 P.3d 253, 258–59 (2007) ("Other jurisdictions that have decided the question appear to be unanimous that *Crawford* does not change the due process standard for confrontation in a probation revocation hearing." (citing *United States v. Williams,* 443 F.3d 35, 45 (2d Cir.2006); *United States v. Kelley,* 446 F.3d 688, 690–92 (7th Cir.2006); *Ash v. Reilly,* 431 F.3d 826, 829–30 (D.C.Cir.2005); *United States v. Rondeau,* 430 F.3d 44, 47–48 (1st Cir.2005); *United States v. Hall,* 419 F.3d 980, 985–86 (9th Cir.), *cert. denied,* 546 U.S. 1080, 126 S.Ct. 838, 163 L.Ed.2d 714 (2005); *United States v. Kirby,* 418 F.3d 621, 627–28 (6th Cir.2005); *United States v. Martin,* 382 F.3d 840, 844 n. 4 (8th Cir.

"[p]robation revocation, like parole revocation, . . . does result in a loss of liberty. Accordingly . . . a probationer, like a parolee, is entitled to a preliminary and a final revocation hearing, under the conditions specified in *Morrissey v. Brewer.*" *Scarpelli*, 411 U.S. at 782, 93 S.Ct. at 1759-60; *see Davis*, 12 Va.App. at 84, 402 S.E.2d at 686. In *Morrissey*, the United States Supreme Court required that the following "minimum requirements of due process" for a revocation hearing be provided:

> (a) written notice of the claimed violations of [probation];
> (b) disclosure to the [probationer] of evidence against him;
> (c) opportunity to be heard in person and to present witnesses and documentary evidence; *(d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);* (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need to be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking [probation].

408 U.S. at 489, 92 S.Ct. at 2604 (emphasis added).[8]

"Specifically, the United States Supreme Court has stated that in revocation hearings 'formal procedures and rules of

2004); *Young v. United States*, 863 A.2d 804, 807–08 (D.C.2004); *Reyes v. State*, 868 N.E.2d 438, 440 n. 1 (Ind.2007); *Commonwealth v. Wilcox*, 446 Mass. 61, 841 N.E.2d 1240, 1247–48 (2006); *State v. Divan*, 724 N.W.2d 865, 870 (S.D.2006); *State v. Abd–Rahmaan*, 154 Wash.2d 280, 111 P.3d 1157, 1160–61 (2005); *see also People v. Johnson*, 121 Cal. App.4th 1409, 18 Cal.Rptr.3d 230, 232 (2004); *People v. Turley*, 109 P.3d 1025, 1026 (Colo.Ct.App.2004); *Jackson v. State*, 931 So.2d 1062[, 1063] (Fla.Dist.Ct.App.2006); *State v. Palmer*, 37 Kan.App.2d 819, 158 P.3d 363, 367 (2007); *State v. Michael*, 891 So.2d 109, 114–15 (La.App. 2 Cir.2005); *State v. Gonzalez*, 212 Or.App. 1, 157 P.3d 266, 267 (2007); *State v. Pauling*, 371 S.C. 435, 639 S.E.2d 680, 682 (S.C.App.2006); *Trevino v. State*, 218 S.W.3d 234, 238–39 (Tex.App.2007))).

**8.** Virginia cases that cite to *Morrissey* inexplicably omit the language "(unless the hearing officer specifically finds good cause for not allowing confrontation)." 408 U.S. at 489, 92 S.Ct. at 2604; *see Dickens*, 52 Va.App. at 417, 663 S.E.2d at 550; *Copeland v. Commonwealth*, 14 Va.App. 754, 756, 419 S.E.2d 294, 295 (1992).

evidence are not employed,' *Scarpelli,* 411 U.S. at 789, 93 S.Ct. at 1763, and that the process of revocation hearings 'should be flexible enough to consider evidence ... that would not be admissible in an adversary criminal trial,' *Morrissey,* 408 U.S. at 489, 92 S.Ct. at 2604." *Dickens,* 52 Va.App. at 421, 663 S.E.2d at 552. "Thus, hearsay evidence, which would normally be inadmissible in a criminal trial, may be admitted into evidence in a revocation hearing based on the court's discretion," *id.* (citing *Morrissey,* 408 U.S. at 489, 92 S.Ct. at 2604), *if the circuit court "specifically finds good cause for not allowing confrontation," Morrissey,* 408 U.S. at 489, 92 S.Ct. at 2604 (emphasis added). Neither our Supreme Court nor this Court have squarely addressed what constitutes "good cause" for denial of the due process right of confrontation in the wake of the many changes wrought by *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and its progeny's construction of the Sixth Amendment Confrontation Clause.

### 1. Testimonial Evidence & the Due Process Right to Confrontation

However, before determining whether "good cause" existed to excuse denying Henderson the right to confrontation, we must first determine whether any due process right to confrontation applicable in the context of a revocation hearing attaches to the testimony of Ortiz in the first place—i.e. whether the evidence sought to be presented constitutes "testimonial hearsay," which in the wake of the United States Supreme Court's decisions in *Crawford,* 541 U.S. 36, 124 S.Ct. 1354, and in *Davis v. Washington,* 547 U.S. 813, 823–26, 126 S.Ct. 2266, 2274–76, 165 L.Ed.2d 224 (2006) (holding the Confrontation Clause applies only to testimonial hearsay after stating this holding was "suggested in *Crawford,* even if not explicitly held," and noting "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter"), is a predicate to the applicability of the right of confrontation under any circumstances. *See also Michigan v. Bryant,* ——

U.S. ——, 131 S.Ct. 1143, 1153, 179 L.Ed.2d 93 (2011) ("We therefore limited the Confrontation Clause's reach to testimonial statements . . . ." (citing *Crawford,* 541 U.S. at 68, 124 S.Ct. at 1373–74)).

As this Court noted in *Dickens,* "the Sixth Amendment right of confrontation is a more rigorous right than the due process requirement in a revocation context because a revocation hearing is not a 'criminal proceeding' and the full panoply of rights due a defendant 'does not apply to [probation] revocation.'" 52 Va.App. at 421–22, 663 S.E.2d at 552 (alteration in original) (quoting *Morrissey,* 408 U.S. at 480, 92 S.Ct. at 2600). Thus, if the Sixth Amendment confrontation right attaches only to testimonial hearsay, then it follows that the more flexible due process right of confrontation in a probation revocation hearing also attaches only to testimonial hearsay. *See id.* at 417, 663 S.E.2d at 550 ("[I]n order to understand the Fourteenth Amendment['s] due process [implicit] right to confrontation, we must begin with a review of the Sixth Amendment['s explicit] right to confrontation.").

Prior to *Crawford,* 541 U.S. 36, 124 S.Ct. 1354, *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), controlled the Sixth Amendment Confrontation Clause jurisprudence through the application of an "indicia of reliability" test. *Crawford* expressly overruled *Roberts.* In *Roberts,* the Supreme Court specifically held

> when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 66, 100 S.Ct. at 2539. In other words, prior to *Crawford,* the Confrontation Clause was satisfied if the witness was unavailable and the hearsay statement was suffi-

ciently reliable to satisfy a long-standing exception to the rule barring hearsay.

In *Lilly v. Virginia*, 527 U.S. 116, 125, 119 S.Ct. 1887, 1894–95, 144 L.Ed.2d 117 (1999), the United States Supreme Court clarified what it meant in *Roberts* when it held that the hearsay statements had to fall within "a firmly rooted hearsay exception." The Supreme Court stated, "a hearsay exception [is] 'firmly rooted' if, in light of 'longstanding judicial and legislative experience,' it 'rests [on] such [a] solid foundation that admission of virtually any evidence within [it] comports with the 'substance of the constitutional protection.'" *Id.* at 126, 119 S.Ct. at 1895 (alterations in original) (internal citations omitted). "Established practice, in short, must confirm that statements falling within a category of hearsay inherently 'carry special guarantees of credibility' essentially equivalent to, or greater than, those produced by the Constitution's preference for cross-examined trial testimony." *Id.* (citation omitted). The Supreme Court then concluded, "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Id.* at 134, 119 S.Ct. at 1899.

The Supreme Court then overruled the so-called "indicia of reliability" test set forth in *Roberts* and *Lilly* in

*Crawford v. Washington*, 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (2004), [and] held that the Confrontation Clause applies to testimonial hearsay and in order for such hearsay to be admissible, the witness must be unavailable and the accused must have had an opportunity for cross-examination. *Id.* at 68 [124 S.Ct. at 1373–74]. The Court noted that the Confrontation Clause targeted a specific "evil," namely the "civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 49 [124 S.Ct. at 1362–63]. The Court reasoned that the Confrontation Clause protects against "testimonial" statements because, it only "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Id.* at 51 [124 S.Ct. at 1364] (quoting 2 N.

Webster, *An American Dictionary of the English Language* (1828)).

*Dickens,* 52 Va.App. at 418, 663 S.E.2d at 551. "The [Supreme] Court stated '[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.' " *Crawford v. Commonwealth,* 281 Va. 84, 97, 704 S.E.2d 107, 115 (2011) (quoting *Crawford,* 541 U.S. at 68–69, 124 S.Ct. at 1374).

In *Melendez–Diaz v. Massachusetts,* —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the United States Supreme Court noted

> [o]ur opinion [in *Crawford* ] described the class of testimonial statements covered by the Confrontation Clause as follows: "Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* at 2531 (quoting *Crawford,* 541 U.S. at 51–52, 124 S.Ct. at 1364 (internal quotation marks and citations omitted)); *see also Crawford,* 281 Va. at 97–98, 704 S.E.2d at 115 (noting the "core class of 'testimonial' statements" provided by the United States Supreme Court in *Crawford,* 541 U.S. at 51–52, 124 S.Ct. at 1364).

In *Crawford,* the Supreme Court provided that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51, 124 S.Ct. at 1364. The Supreme Court went on to hold that, "[s]tatements

taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Id.* at 52, 124 S.Ct. at 1364. "In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class." *Id.* at 53, 124 S.Ct. at 1365. However, the Supreme Court did not define what it meant by "interrogation" in *Crawford*, but provided that "[w]e use the term 'interrogation' in its colloquial, rather than any technical legal, sense," and further that "one can imagine various definitions . . ., and we need not select among them in this case." *Id.* at 53 n. 4, 124 S.Ct. at 1365.

The United States Supreme Court was given the opportunity in *Davis* and *Hammon v. Indiana*, 546 U.S. 1213, 126 S.Ct. 1457, 164 L.Ed.2d 131 (2006), to consider whether statements made to law enforcement personnel during a 911 call and at a crime scene were testimonial, and specifically addressed what it meant by "interrogation" when it was required "to determine more precisely which police interrogations produce testimony." *Davis,* 547 U.S. at 822, 126 S.Ct. at 2273. In making this determination, the United States Supreme Court

> further clarified what constitutes a "testimonial" statement: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

*Crawford,* 281 Va. at 98, 704 S.E.2d at 116 (emphasis added) (quoting *Davis,* 547 U.S. at 822, 126 S.Ct. at 2273–74). The United States Supreme Court explained that when it said in *Crawford* that

> "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immedi-

ately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial.

*Davis,* 547 U.S. at 826, 126 S.Ct. at 2276 (alteration in original) (quoting *Crawford,* 541 U.S. at 53, 124 S.Ct. at 1365). Thus, "a statement is testimonial if it is given while '[t]here was no emergency in progress,' and is made for the purpose of 'establish[ing] or prov[ing] past events *potentially relevant* to later criminal prosecution.'" *Crawford,* 281 Va. at 98, 704 S.E.2d at 116 (alterations in original) (quoting *Davis,* 547 U.S. at 822, 829, 126 S.Ct. at 2273–74, 2277–78).

The United States Supreme Court most recently addressed the Sixth Amendment Confrontation Clause in *Bryant,* 131 S.Ct. 1143, and further expounded upon how a court determines whether the "primary purpose" of a police interrogation objectively indicates that it was "to enable police assistance to meet an ongoing emergency." *Id.* at 1150. In considering whether the statements of a dying man made to the police were testimonial, the Supreme Court noted that, "the most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Id.* at 1155. However, the Supreme Court went on and explained,

[w]hen, as in *Davis,* the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause. But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists,

the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* (emphasis in original).[9]

 In determining "whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Id.* at 1156 (quoting *Davis,* 547 U.S. at 822, 126 S.Ct. at 2273). Unlike in *Davis, Hammon,* and *Bryant,* the context in the present case involves a detective apparently questioning witnesses at some point after two alleged robberies had already occurred, and there was no evidence of any immediate threat to either the witnesses or the detective. *Id.* ("*Davis* and *Hammon* arose in the domestic

---

9. In *Bryant,* the United States Supreme Court noted that there are

[m]any other exceptions to the hearsay rules [that] similarly rest on the belief that certain statements are, by their nature, made for a purpose other than use in a prosecution and therefore should not be barred by hearsay prohibitions. *See, e.g.,* Fed. Rule Evid. 801(d)(2)(E) (statement by a co-conspirator during and in furtherance of the conspiracy); 803(4) (Statements for Purposes of Medical Diagnosis or Treatment); 803(6) (Records of Regularly Conducted Activity); 803(8) (Public Records and Reports); 803(9) (Records of Vital Statistics); 803(11) (Records of Religious Organizations); 803(12) (Marriage, Baptismal, and Similar Certificates); 803(13) (Family Records); 804(b)(3) (Statement Against Interest); *see also Melendez–Diaz v. Massachusetts,* 557 U.S. ——, ——, 129 S.Ct. [2527], 2539–40 [174 L.Ed.2d 314, 329 (2009)] ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because-having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial"); *Giles v. California,* 554 U.S. [353], 376, 128 S.Ct. 2678 [2692–93, 171 L.Ed.2d 488 (2008)] (noting in the context of domestic violence that "[s]tatements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules"); *Crawford,* 541 U.S. at 56, 124 S.Ct. 1354 [1367, 158 L.Ed.2d 177] ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy").

131 S.Ct. at 1157 n. 9.

violence context. . . . We now face a new context: a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim. Thus, we confront for the first time circumstances in which the 'ongoing emergency' discussed in *Davis* extends beyond an initial victim to a potential threat to the responding police and the public at large.").

As the Supreme Court held in *Hammon*, "[i]t is entirely clear from the circumstances [in this case] that the interrogation[s were] part of an investigation into possibly criminal past conduct," *Davis*, 547 U.S. at 829, 126 S.Ct. at 2278, and thus the primary purpose of the interrogations was " 'for the purpose of establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution,' " *Crawford*, 281 Va. at 98, 704 S.E.2d at 116 (alterations in original) (quoting *Davis*, 547 U.S. at 822, 126 S.Ct. at 2274). As stated, the challenged evidence in the present case is a detective's testimony that included, and was based on, information provided to her by witnesses during her investigation of two alleged robberies after they had occurred—" 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Melendez–Diaz*, 129 S.Ct. at 2531 (quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364).

With regard to the first alleged crime that took place on October 2, 2009, Ortiz spoke with the victim and his daughter by telephone four days after it had occurred and after the initial officers had done a full preliminary investigation in order to obtain the facts regarding the alleged robbery. On October 8, 2009, Ortiz was called to come down to the police station regarding the second alleged crime that had occurred that day, and she stated that she met with the victim at the police station that day regarding the alleged home invasion robbery. When she spoke with the individuals, it was in the formal setting of a police officer investigating a past crime by seeking facts regarding each alleged robbery for the purpose of apprehending and prosecuting the perpetrator. *Bryant,*

131 S.Ct. at 1160 ("Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution,' [*Davis,* 547 U.S.] at 822, 126 S.Ct. [at 2274], informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent.").

In addition, the information was not provided during an ongoing emergency in order to enable police to meet the emergency and to understand what was happening; but rather, the detective was seeking to determine what had already occurred, and to preserve it for later use in connection with court proceedings. *Crawford,* 281 Va. at 98, 704 S.E.2d at 116. Ortiz obtained the information from *ex parte* communication with the witnesses after the alleged robberies had occurred during her investigation of the alleged crimes—"the principal evil at which the Confrontation Clause was directed." *Crawford,* 541 U.S. at 50, 124 S.Ct. at 1363. Further, Ortiz was engaged "in the more traditional law enforcement functions of observation and investigation of crime," which is an adversarial setting. *Dickens,* 52 Va.App. at 419, 663 S.E.2d at 551 (noting that the reports in *Michels* did not resemble *ex parte* communication because they " 'were prepared in a non-adversarial setting in which the factors likely to cloud the perception of an official engaged in the more traditional law enforcement functions of observation and investigation of crime are simply not present' " (quoting *Michels,* 47 Va.App. at 469–70, 624 S.E.2d at 680)). Lastly, none of the "standard rules of hearsay, designed to identify some statements as reliable" are applicable to Ortiz's testimony such that the "admissibility of [the] statement[s] is the concern of state and federal rules of evidence, [and] not the Confrontation Clause." *Bryant,* 131 S.Ct. at 1155.

Thus, we conclude that Ortiz's testimony was testimonial hearsay, to which the limited Fourteenth Amendment due process right of confrontation applies.

## 2. "Good Cause" Exception

■■■ In turning to the relaxed standards of, and the "good cause" exception to, the right to confrontation applicable at probation revocation hearings, we note that a defendant is permitted the "right to confront and cross-examine adverse witnesses *(unless the hearing officer specifically finds good cause for not allowing confrontation)* . . . ." *Morrissey,* 408 U.S. at 489, 92 S.Ct. at 2604 (emphasis added). In determining whether to admit testimonial hearsay evidence under the "good cause" exception, other courts have adopted either of two methods in determining whether evidence admitted at a probation revocation hearing violated the limited due process right to confrontation and cross-examination. In *Reyes v. State,* 868 N.E.2d 438, 441 (Ind.2007), the Indiana Supreme Court explained both methods:

> In one, the trial court employs a balancing test that weighs the probationer's interest in confronting a witness against the interests of the State in not producing the witness. *E.g., United States v. Martin,* 382 F.3d 840, 844–45 (8th Cir.2004). In the balancing test, the State is required to show good cause for denying confrontation. *See United States v. Rondeau,* 430 F.3d 44, 48 (1st Cir.2005). In another test, the trial court determines whether the evidence reaches a certain level of reliability, or if it has a substantial guarantee of trustworthiness. *E.g., United States v. Kelley,* 446 F.3d 688, 692 (7th Cir.2006). The requirement, found in *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593 [at 2604], that the trial court find "good cause" before denying the right to confrontation plays an explicit role when a trial court performs a balancing test; however, this does not mean that *Morrissey*'s good cause requirement is not addressed in the substantial trustworthiness test. . . . [T]he substantial trustworthiness test implicitly incorporates good cause into its calculus.

*See also People v. Breeding,* 284 Mich.App. 471, 485, 772 N.W.2d 810 (2009) (quoting *Reyes,* 868 N.E.2d at 441).

While Virginia has not expressly adopted a specific approach, standard, or test to be applied to determine whether "good cause" exists to deny the right of confrontation, this Court briefly discussed both tests in *Dickens,* 52 Va.App. at 417, 663 S.E.2d at 550. In *Dickens,* this Court reviewed the Sixth Amendment right to confrontation in order to understand the Fourteenth Amendment due process right to confrontation, found "no need to embrace [the] balancing test since the reliability of official records has long been established," and concluded the hearsay evidence—an affidavit that was an official record—was nontestimonial, fell within the official records hearsay exception, and was reliable. *Id.* at 419–20, 422–23, 663 S.E.2d at 551–52, 553. While not explicitly stating which test the circuit courts must apply in these situations, this Court, in dicta, implicitly approved the reliability test in *Dickens* when we noted, "the United States Court of Appeals for the Fourth Circuit has held that hearsay evidence is admissible in probation revocation hearings if it is sufficiently reliable." *Id.* at 423, 663 S.E.2d at 553 (citing *United States v. McCallum,* 677 F.2d 1024 (4th Cir.1982)); [10] *see also Turner v. Commonwealth,* 278 Va. 739, 742, 685 S.E.2d 665, 667 (2009) ("Hearsay evidence has been held admissible in federal probation and parole revocation proceedings where the evidence is 'demonstrably reliable.' In *Dickens,* [this Court] reached a similar conclusion in the context of the reliability of official records." (citations omitted)).[11]

---

**10.** In *Dickens,* the record in question was an "affidavit subscribed to and sworn to ... by the custodian of records for the Sex Offender & Crimes Against Minors Registry of the Virginia Department of State Police averring that appellant had not registered with the registry...." 52 Va.App. at 416, 663 S.E.2d at 550. Thus, we note that any implicit approval of the reliability test in *Dickens* is necessarily dicta since official or business records or the lack thereof, such as those at issue in *Dickens,* ordinarily do not constitute "testimonial hearsay" triggering applicability of the right of confrontation in the first instance.

**11.** Contrary to the dissent's assertion, the Supreme Court of Virginia did not adopt the reliability test in *Turner,* 278 Va. 739, 685 S.E.2d 665. In *Turner,* the Virginia Supreme Court addressed the *evidentiary* admissibility, not the constitutionality under the Due Process Clause, of polygraph examination results in probation revocation hearings, and

Although the Supreme Court of the United States has yet to review either due process test applied for finding "good cause" to deny the right of confrontation, both tests have been found by various of our sister states to pass current constitutional muster.

### a. Reliability Test [12]

 Under the reliability test, "the trial court determines whether the evidence reaches a certain level of reliability, or if it has a substantial guarantee of trustworthiness," and "the substantial trustworthiness test implicitly incorporates good cause into its calculus." *Reyes,* 868 N.E.2d at 441 (citations

---

held that they are inadmissible based on a "long line of cases" that held, " 'polygraph examinations are so thoroughly unreliable as to be of no proper *evidentiary* use. . . . The point of these cases is that the lie-detector or polygraph has an aura of authority while being wholly unreliable.' " *Id.* at 743, 685 S.E.2d at 667 (emphasis added) (quoting *White v. Commonwealth,* 41 Va.App. 191, 194, 583 S.E.2d 771, 772 (2003)). While the Virginia Supreme Court noted the "demonstrably reliable" standard applied in federal proceedings and the "similar conclusion" reached in *Dickens,* it disagreed with the Commonwealth's assertion that polygraph test results should be admitted under the "relaxed" standard in probation proceedings. The Supreme Court specifically stated that, "[p]olygraph test results fall far short of the 'demonstrably reliable' hearsay evidence that may be admitted under those 'relaxed' standards," but then proceeded to cite the rule that a court " 'has no discretion to admit clearly inadmissible evidence. . . .' " *Id.* (citation omitted). Thus, the focus of the decision was the evidentiary admissibility of polygraph tests based upon their lack of scientific reliability and not on their constitutionality as admissible hearsay for Confrontation Clause purposes.

12. While it may be reasonable to question the continued applicability of a reliability test in light of the United States Supreme Court's overruling of *Roberts* in *Crawford,* as previously noted, we observe that the Sixth Amendment jurisprudence is not directly applicable outside of a trial setting, and serves merely as a guide in the application of the limited confrontation right available in probation revocation hearings. In addition, the Supreme Court's recent decision in *Bryant* arguably resurrects some semblance of a reliability analysis even in Sixth Amendment confrontation cases. *See Bryant,* 131 S.Ct. at 1174 (Scalia, J., dissenting) ("[T]oday's decision is not only a gross distortion of the facts. It is a gross distortion of the law—a revisionist narrative in which *reliability* continues to guide our Confrontation Clause jurisprudence, at least where emergencies and faux emergencies are concerned." (emphasis added)).

omitted); *see also Kelley*, 446 F.3d at 692; *Crawford v. Jackson*, 323 F.3d 123, 131 (D.C.Cir.2003); *Hampton v. State*, 203 P.3d 179, 184–85 (Okla.Crim.App.2009). "Hearsay evidence has been held admissible in federal probation and parole revocation proceedings where the evidence is 'demonstrably reliable.'" *Turner*, 278 Va. at 742, 685 S.E.2d at 667 (quoting *McCallum*, 677 F.2d at 1026). In *Curtis v. Chester*, 626 F.3d 540, 548 (10th Cir.2010), the court noted the following "[e]xamples of evidence possess[ed] recognized indicia of reliability":

> (1) the conventional substitutes for live testimony (e.g., affidavits, depositions, and documentary evidence), (2) statements falling under an established exception to the hearsay rule, (3) statements corroborated by detailed police investigative reports, and (4) statements corroborated by the releasee's own statements. *See* [*Scarpelli*], 411 U.S. at 782 n. 5, 93 S.Ct. 1756 [at 1760]; *Prellwitz v. Berg*, 578 F.2d 190, 193 (7th Cir.1978) (evidence falling under the "business record" hearsay exception is reliable); *Jackson*, 323 F.3d at 130–31 (evidence corroborated by observations in a police investigative report is reliable); *McCallum*, 677 F.2d at 1026 (evidence corroborated by the releasee's testimony is reliable).

*See also United States v. McCormick*, 54 F.3d 214, 224 (5th Cir.1995) (concluding that "[s]ubstantial evidence enhanced the reliability of the information contained in the ... report"); *United States v. Garcia*, 771 F.2d 1369 (9th Cir.1985) (holding evidence reliable where defendant's in-court statements supported the evidence and he pled guilty on numerous charges before several different judges). In *United States v. Lloyd*, 566 F.3d 341, 345 (3d Cir.2009), the court noted,

> [h]earsay given under oath, [*United States v.*] *Comito*, 177 F.3d [1166,] 1171 [ (9th Cir.1999) ]; *Crawford*, 323 F.3d at 129, replete with detail, *United States v. Bell*, 785 F.2d 640, 644 (8th Cir.1986); *Crawford*, 323 F.3d at 129, or supported by corroborating evidence, *Kelley*, 446 F.3d at 692; *Martin*, 382 F.3d at 846, has been recognized as reliable. Conversely, out-of-court statements reflecting an adversarial relationship with the accused, *Comito*, 177 F.3d at 1171, or contain-

ing multiple layers of hearsay, *United States v. Fennell,* 65 F.3d 812, 813 (10th Cir.1995); *Crawford,* 323 F.3d at 129, have been recognized as unreliable.

In turning to the facts in this case, Ortiz's hearsay testimony regarding both alleged crimes based solely on her conversations with the witnesses does not rise to the level of demonstrable reliability required for admissibility. The hearsay statements used to establish that Henderson violated the conditions of probation meet no firmly rooted exception to the hearsay rule that implies their inherent reliability. In addition, the record does not convey whether Ortiz was speaking purely from her memory in conveying the statements of the witnesses, or whether she was utilizing a police report or her notes thus further diminishing the reliability of her testimony. *See Comito,* 177 F.3d at 1171 (concluding that "[u]nsworn verbal allegations are, in general, the least reliable type of hearsay ..."); *United States v. Pratt,* 52 F.3d 671, 677 (7th Cir.1995) (holding the officer's hearsay testimony was reliable because it was consistent with the written statements of the victim in addition to other corroborating information).

With regard to the first incident, Ortiz spoke with both the victim and his daughter four days after the incident had occurred, and after both witnesses had spoken with Henderson in person regarding the phone calls.[13] While

---

**13.** The dissent contends that Henderson's failure "to present any evidence to contradict the Commonwealth's evidence" further supports the reliability of Ortiz's hearsay testimony regarding the first incident. We disagree with the dissent's apparent view that Henderson had any burden to rebut the Commonwealth's evidence as a prerequisite to receiving due process protection. While "formal procedures and rules of evidence are not employed" in probation revocation hearings, *Scarpelli,* 411 U.S. at 789, 93 S.Ct. at 1763, the Commonwealth was seeking the revocation of Henderson's probation and the execution of his previously suspended sentence, and thus the burden of persuasion of a probation violation remained with the Commonwealth throughout the hearing as it does with any party seeking a judgment or other relief. *See Hall v. Hall,* 181 Va. 67, 80, 23 S.E.2d 810, 815–16 (1943) ("The burden of proving testamentary capacity is on the propounder of the will and continues upon him throughout any contest on that question. *Dickens v. Bonnewell,* 160 Va. 194, 168 S.E. 610 [ (1933) ]; *Good v.*

**394**

Henderson spoke with Ortiz and she testified that "[h]e tells me basically the same thing," Henderson's corroboration would have been limited to the fact that he had told the victim and his daughter that "he lends his phone to a lot of people and he do[esn't] remember who he loaned it to that day." While the rest of the victim's statements to Ortiz were detailed regarding the rest of the alleged robbery and the actual individual committing the robbery, the only portion relating to Henderson was regarding the initial phone call to the victim, and the fact that it came from his cell phone.

In turning to the second alleged crime, the victim gave his eyewitness testimony to Ortiz at the police station at some point after the incident occurred, but the record is not clear at what point it took place.[14] In addition, the information regarding the alleged home invasion robbery was not detailed. Ortiz testified that the victim informed her that three subjects knocked on his front door, entered the unlocked door, and stole some of his personal property. Ortiz stated that the victim told her subject number one had a gun and that subject number two was "Terrence" whom he had met a couple of weeks prior at the probation office. The victim then picked Henderson as one of the individuals out of a series of photos that Ortiz showed him. With regard to the second alleged crime, Henderson's statement to Ortiz only corroborated that he knew one of the co-defendants and that he had been in the

---

*Dyer*, 137 Va. 114, 119 S.E. 277 [(1923)]. This burden of proof is not to be confused with the burden of producing evidence. That burden frequently passes from party to party during the progress of a trial, but the necessity of proving his case always rests upon the plaintiff and never shifts. *Riggsby v. Tritton*, 143 Va. 903, 129 S.E. 493, 45 A.L.R. 280 [(1925)]."). Therefore, any suggestion by the dissent that Henderson's failure to rebut the evidence he objected to in the first place somehow shows its constitutional reliability is nothing less than an improper shifting of the burden of persuasion from the Commonwealth to Henderson.

14. Ortiz testified that she "received a phone call at night at my house to come in to investigate a home invasion robbery" and that she "came to the station, that was October 8th, met with the victim." She later testified that the home invasion robbery took place "around 11:00 at night."

vehicle that was involved in the investigation in which some of the stolen property was later discovered by the police.

Because the out-of-court statements made to Ortiz were neither inherently reliable by satisfying a firmly rooted exception to the hearsay rule nor were the statements corroborated by other evidence presented at the revocation hearing, the hearsay evidence offered by Ortiz does not rise to the level of being so demonstrably reliable that Henderson's limited right to confrontation in a probation revocation hearing should have been denied.

### b. Balancing Test

 Alternatively, under the balancing test, the court "weighs the probationer's interest in confronting a witness against the interests of the State in not producing the witness," and the "State is required to show good cause for denying confrontation." *Reyes*, 868 N.E.2d at 441 (citations omitted); *see also Lloyd*, 566 F.3d at 344–45; *United States v. Williams*, 443 F.3d 35, 46 (2d Cir.2006); *United States v. Taveras*, 380 F.3d 532, 537 (1st Cir.2004); *Martin*, 382 F.3d at 846; *Comito*, 177 F.3d at 1171–72.

 In assessing the probationer's interest in confronting a witness,

> although every releasee has the right to confrontation, this right is not static, but is of greater or lesser significance depending on the circumstances. [*United States v.*] *Martin*, 984 F.2d [308,] 310–11 [ (9th Cir.1993) ]. The weight to be given the right to confrontation in a particular case depends on two primary factors: the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence. *See id.* at 311. As the Martin court emphasized, "the more significant particular evidence is to a finding, the more important it is that the releasee be given an opportunity to demonstrate that the proffered evidence does not reflect 'verified fact.' " *Id.* So, too, the more subject to question the accuracy and reliability of the proffered evidence, the greater the releas-

ee's interest in testing it by exercising his right to confrontation.

*Comito,* 177 F.3d at 1171. However,

> [i]n the balancing process, the defendant's interest in confronting the declarant is entitled to little, if any, weight where the declarant's absence is the result of intimidation by the defendant: Where a defendant has procured the declarant's unavailability "by chicanery, ... by threats, ... or by actual violence or murder," the defendant is deemed to have "waived his sixth amendment rights and, *a fortiori,* his hearsay objection" to the admission of the declarant's statements.

*Williams,* 443 F.3d at 45 (quoting *United States v. Mastrangelo,* 693 F.2d 269, 272–73 (2d Cir.1982), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 343 (1984)).

 "In assessing the government's position, the [court] should consider, first, 'the explanation the government offers of why confrontation is undesirable or impracticable' and, second, 'the reliability of the evidence which the government offers in place of live testimony.'" *Martin,* 382 F.3d at 845 (quoting *Bell,* 785 F.2d at 643). "'Where the government demonstrates that the burden of producing live testimony would be inordinate and offers in its place hearsay evidence that is demonstrably reliable, it has made a strong showing of good cause.'" *Id.* at 845 (quoting *Bell,* 785 F.2d at 643). "'Where, on the other hand, ... the government neither shows that presenting live testimony would be unreasonably burdensome nor offers hearsay evidence that bears indicia of reliability, the probationer is entitled to confrontation.'" *Id.* at 845 (quoting *Bell,* 785 F.2d at 643).

 Henderson's interest in confronting the witnesses was high in that the nature of the statements was "'detailing the specific criminal wrongdoing of the defendant'" in crimes that he denied any involvement in. *Dickens,* 52 Va.App. at 419, 663 S.E.2d at 551 (quoting *Jasper v. Commonwealth,* 49 Va.App. 749, 755, 644 S.E.2d 406, 410 (2007)); *see also McCormick,* 54 F.3d at 222 ("It follows, therefore, that a releasee's

interest in cross-examining a laboratory technician regarding a scientific fact is less than would be his interest, for example, in confronting a hearsay declarant regarding what the declarant may have seen. The truth of the former can be verified through methods of science; the truth of the later can best be verified through the rigor of cross-examination, conducted under the circumspect eye of the district court.").

Henderson was charged with failure to obey the law, failure to be of general good behavior, and failure to report an arrest, and thus the hearsay testimony was important to any finding with respect to the alleged violations. Ortiz's testimony was a detailed recitation of the facts given to her by the unsworn verbal allegations of witnesses of two alleged crimes. *Comito,* 177 F.3d at 1171 ("Unsworn verbal allegations are, in general, the least reliable type of hearsay...."). The only other evidence in the record supporting Ortiz's testimony was Henderson's corroboration of what he told the alleged victim of the first crime and his daughter regarding his phone—that he lends his phone to a lot of people, and he could not remember whom he had loaned it to that day. Further, while Henderson's mother testified at trial, her testimony of the facts regarding where Henderson was on the night of the alleged second crime was adverse to both Henderson's and Ortiz's testimony, and there is no additional evidence in the record corroborating Ortiz's testimony regarding the witnesses' statements she testified to. *Curtis,* 626 F.3d at 547 ("Because the credibility of the victim's statements are supported by other sources, Curtis has a diminished interest in testing those statements through confrontation." (citing *Comito,* 177 F.3d at 1171)). Thus, the hearsay testimony was indisputably important to the circuit court's finding of a violation.

In turning to any interest on the part of the Commonwealth in denying Henderson an opportunity to confront his accusers, the prosecution did not meet its burden of establishing why it should be excused from producing the adverse witnesses for cross-examination, nor is the evidence demonstrably reliable as previously discussed. There is no evidence in the record

that the Commonwealth made any good faith attempt to subpoena the witnesses or otherwise produce them in court. In addition, there is no evidence in the record that the witnesses had moved or that they could not be located. *Id.* at 547–48 ("In contrast, the government's 'good cause for not allowing confrontation,' *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593 [at 2604], was that the victim could not be located.").

The first alleged victim merely informed Ortiz that he "really didn't want to file charges because people knew his daughter, and they all were in the neighborhood, they live in the same neighborhood, they knew where he lived." This does not rise to the level of overcoming Henderson's interest in confronting the witness, nor is it evidence as to why the Commonwealth could not produce the victim or his daughter at the probation revocation hearing. Ortiz testified that she met with the second alleged victim and his mother who refused to testify because they were scared of retaliation. *See Williams,* 443 F.3d at 45–47. However, the only evidence of retaliation in the record involved the second victim's mother who informed Ortiz that she had heard gunshots around her house the day before and that it really scared her. Ortiz testified that she had heard one of the other individuals involved in the second crime and his girlfriend refer to a gun in a telephone conversation, but there was no information provided to the circuit court establishing any link between Henderson, the gun referred to, and the gunshot heard near the house.

In short, the record reflects no reason advanced by the Commonwealth as to what governmental interest was served by not producing the witnesses against Henderson. Thus, Henderson's interest in confronting the witnesses who spoke with Ortiz necessarily outweighed the interest of the Commonwealth in not producing them. In this case, the Commonwealth neither satisfied Henderson's due process right to confront the adverse witnesses against him nor adequately justified its failure to do so. *Curtis,* 626 F.3d at 548 ("Instead of hindering Curtis's ability to test the victim's statements, the government did as much as it could to facilitate it."). Thus,

the circuit court could not, and therefore did not, balance Henderson's interest in confronting the witnesses against him against any interest the Commonwealth may have had in denying Henderson that right.

## III. CONCLUSION

As discussed above, although the reliability test has been found by some courts to satisfy the minimum requirements of the Due Process Clause, many of those cases pre-date the jurisprudential sea change wrought by *Crawford v. Washington* and its progeny. Thus, although the circuit court would not necessarily have erred had it applied the reliability test to the testimony of Ortiz, we think that the balancing test ought to be the preferred test utilized in the courts of the Commonwealth since it requires confrontation *ab initio* unless, and until, the Commonwealth provides a reason sufficient to outweigh an accused's interest in confronting and cross-examining the evidence against him. Put differently, we hold that in non-trial proceedings involving an accused's liberty interest, an approach that requires the Commonwealth to explain and justify its failure to provide confrontation *before* considering the evidentiary admissibility of any testimonial hearsay is more consistent with the overall purpose of both *Morrissey*, which requires an opportunity to confront testimonial hearsay as the default position for any due process analysis, and the analytical framework found in the post-*Roberts* cases of *Crawford, Davis, Melendez–Diaz*, and *Bryant*. As discussed above, what all of these cases have in common is that they require more than mere considerations of reliability in permitting the use of testimonial hearsay in a trial setting, and thus we think the balancing test is more faithful to current confrontation jurisprudence in the context of providing due process in a non-trial proceeding involving a liberty interest.

However, in any event, in this case the circuit court did not apply either test in overruling Henderson's objection to Ortiz's testimony. Thus, the record before us fails to establish "good cause" for denying Henderson an opportunity to confront and cross-examine the witnesses against him, and therefore the

circuit court erred in admitting the testimonial hearsay evidence offered by Ortiz.

For these reasons, we reverse the judgment of the circuit court, and remand for a new probation revocation hearing consistent with this opinion if the Commonwealth is so advised.

*Reversed and remanded.*

HALEY, J., dissenting.

I respectfully dissent.

## I. INTRODUCTION

The issue here for resolution is whether testimonial hearsay was sufficiently reliable for admission in a probation revocation hearing.[15] Under *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972), for reasons of due process, a defendant in a probation revocation hearing has "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." Courts have developed two tests to determine whether good cause exists. Virginia has adopted a reliability test that admits hearsay if it is sufficiently reliable. While one might appreciate the majority's analysis of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), as applicable in the context of criminal trials, that analysis has no bearing on revocation proceedings. I would hold that the hearsay here was properly admissible under existing Virginia jurisprudence.

## II. TWO STANDARDS FOR DETERMINING WHETHER HEARSAY IS ADMISSIBLE

As the majority acknowledges, two standards have evolved for determining the admissibility of hearsay in a revocation

---

**15.** I will assume without deciding that the challenged evidence was "testimonial hearsay."

hearing: the reliability test and the balancing test. As will be shown later, Virginia has adopted the reliability test.

Under the balancing test, a court weighs a defendant's "interest in confronting a particular witness against the government's good cause for denying it, particularly focusing on the indicia of reliability of a given hearsay statement." *United States v. McCormick*, 54 F.3d 214, 221 (5th Cir.1995); *see also United States v. Williams*, 443 F.3d 35, 45 (2d Cir.2006).

Under the reliability test, a court "allows the admission of hearsay evidence without a showing of cause for the declarant's absence if the evidence is sufficiently reliable." *Curtis v. Chester*, 626 F.3d 540, 545 (10th Cir.2010). Reliable evidence under this test has also been described as evidence having "substantial guarantees of trustworthiness." *Egerstaffer v. Israel*, 726 F.2d 1231, 1234 (7th Cir.1984). "The [Supreme] Court established the good cause showing in *Morrissey* to limit the substantive use of unreliable evidence at revocation hearings. However, if the proffered evidence itself bears substantial guarantees of trustworthiness, then the need to show good cause vanishes." *Id.* Another court explained that substantial trustworthiness in hearsay evidence represents good cause for not producing live testimony. *Reyes v. State*, 868 N.E.2d 438, 441–42 (Ind.2007). "In other words, if reliable hearsay is presented, the good cause requirement is satisfied." *Commonwealth v. Negron*, 441 Mass. 685, 808 N.E.2d 294, 300 (2004).

Courts have considered a number of factors in determining whether hearsay evidence is reliable. Courts are often concerned with whether other evidence corroborates the hearsay. *United States v. Rondeau*, 430 F.3d 44, 48 (1st Cir.2005); *United States v. Martin*, 382 F.3d 840, 846 (8th Cir.2004); *Egerstaffer*, 726 F.2d at 1235. Another indication of reliability is that the evidence is "quite detailed," providing "a fairly full account of the circumstances." *Crawford v. Jackson*, 323 F.3d 123, 130 (D.C.Cir.2003); *see also United States v. Chin*, 224 F.3d 121, 124 (2d Cir.2000); *Egerstaffer*, 726 F.2d at 1235. Also relevant are admissions from the defendant corroborating

the challenged hearsay, the failure of the defendant to present evidence, and internal corroboration within the hearsay. *Crawford,* 323 F.3d at 130. Statements possess less reliability when they come from an adversarial relationship between the person reporting the statement and the person who made it, *United States v. Bell,* 785 F.2d 640, 644 (8th Cir.1986), when they represent "self-serving statements," *Farrish v. Miss. State Parole Bd.,* 836 F.2d 969, 978 (5th Cir.1988), or when they contain multiple levels of hearsay, *United States v. Lloyd,* 566 F.3d 341, 345 (3d Cir.2009).

## III. THE LAW IN VIRGINIA

This Court considered the admissibility of hearsay evidence in the probation revocation context in *Dickens v. Commonwealth,* 52 Va.App. 412, 663 S.E.2d 548 (2008). There the hearsay evidence consisted of an affidavit from an official that the defendant had not registered as a sex offender between specified dates. *Id.* at 416, 663 S.E.2d at 550. While the Court upheld the affidavit's admission based on "the reliability of official records," it noted that "the United States Court of Appeals for the Fourth Circuit has held hearsay evidence is admissible in probation revocation hearings if it is sufficiently reliable." *Id.* at 423, 663 S.E.2d at 553 (citing *United States v. McCallum,* 677 F.2d 1024 (4th Cir.1982)).

Our Supreme Court later evaluated the standard for admitting hearsay during probation revocation hearings in *Turner v. Commonwealth,* 278 Va. 739, 685 S.E.2d 665 (2009). The issue concerned the admissibility of polygraph test results. *Id.* at 741, 685 S.E.2d at 666. The Court stated that "[h]earsay evidence has been held admissible in federal probation and parole revocation proceedings where the evidence is 'demonstrably reliable.'" *Id.* at 742, 685 S.E.2d at 667 (quoting *McCallum,* 677 F.2d at 1026). The Court then held that "[p]olygraph test results fall far short of the 'demonstrably reliable' hearsay evidence that may be admitted" during probation revocation hearings. *Id.* at 743, 685 S.E.2d at 667. In making this holding while quoting the standard from *McCal-*

*lum,* the Court plainly adopted the *McCallum* standard of admissibility.

In *McCallum,* the court applied the reliability standard. The defendant objected to the admission of hearsay evidence in the form of a report from two employees of the center he was sent to upon his release from incarceration. 677 F.2d at 1025. The report detailed numerous instances of poor conduct by the defendant, and the defendant admitted most of these. *Id.* In considering the defendant's right to confront the report's authors, the court noted that other courts had "permitted the introduction of 'demonstrably reliable' hearsay evidence in probation revocation proceedings." *Id.* at 1026. The court then held: "The record discloses that the letter from the . . . center was reliable evidence. It was in the nature of an official report to the United States probation officer in Atlanta from the center's federal program coordinator and its counselor. The reliability of the report was also established by McCallum's testimony. . . ." *Id. McCallum* has been cited as applying the reliability standard. *Curtis,* 626 F.3d at 545.

In addition to the principle that a decision of the Supreme Court of Virginia is controlling on this Court, we are further bound by the rule of interpanel accord. That rule mandates that the "decision of one panel becomes a predicate for application of the doctrine of *stare decisis* and cannot be overruled except by the Court of Appeals sitting *en banc* or by the Virginia Supreme Court." *Clinchfield Coal Co. v. Reed,* 40 Va.App. 69, 73, 577 S.E.2d 538, 540 (2003) (internal quotation marks omitted); *see also Congdon v. Congdon,* 40 Va.App. 255, 265, 578 S.E.2d 833, 838 (2003).

It is my position that the majority does not comport with these principles. Rather, the majority holds a trial court does not err by applying the reliability test, but "the balancing test ought to be the preferred test."

Appellate courts make decisions in part "as a guide for the trial courts." *Oak Knolls Realty Corp. v. Thomas,* 212 Va. 396, 397, 184 S.E.2d 809, 810 (1971); *see also Smith v. Commonwealth,* 56 Va.App. 351, 367, 693 S.E.2d 765, 773

(2010) (Petty, J., dissenting) ("Fortunately, the Supreme Court ... expressly defined the term [jurisdiction] so as to guide both the bench and bar....").

The majority adopts neither the reliability test nor the balancing test. This holding will result in inconsistent decisions throughout Virginia. A defendant convicted in one jurisdiction that uses the reliability test will be released in another that uses the balancing test if the prosecutor fails to offer a reason for denying confrontation, even though both cases may involve the same evidence. In declining to adopt either test, the majority offers little direction to counsel or the trial court.

## IV. NON–APPLICABILITY OF *CRAWFORD*

The majority finds the balancing test preferred in part because it "is more consistent with the ... analytical framework found in" *Crawford*. However, as the majority previously acknowledged, "[o]ther jurisdictions that have decided the question appear to be unanimous that *Crawford* does not change the due process standard for confrontation in a probation revocation hearing." [16] *State v. Rose*, 144 Idaho 762, 171

---

16. In spite of the unambiguous nature of case law on this topic, the majority laments the inapplicability of *Crawford* and tries to make it have application as a theme. In footnote seven, the majority correctly acknowledges that *Crawford* does not apply. Soon afterward, however, the majority notes that Virginia courts have not "squarely addressed what constitutes 'good cause' for denial of the due process right of confrontation in the wake of the many changes wrought by *Crawford*." The majority's earlier footnote would seem to make clear there were no such changes in this context. In footnote twelve, the majority questions why *Crawford* does not apply while also acknowledging this to be the case, stating "it may be reasonable to question the continued applicability of a reliability test in light of ... *Crawford* ... [but] we observe that ... [*Crawford*] is not directly applicable outside of a trial setting and serves merely as a guide." For reasons discussed above, *Crawford* is not even a "guide." In the conclusion section, *Crawford* for the first time becomes for this case a "jurisprudential sea change." The majority suddenly finds the balancing test persuasive in part because of "the analytical framework found in the post-*Roberts* cases of *Crawford, Davis, Melendez–Diaz,* and *Bryant*." Although a conclusion section serves merely as a summary of prior analysis, the majority makes law in

P.3d 253, 258 (2007) (citing numerous cases). *Crawford* "says nothing about whether, or when, confrontation may be denied. The minimum due process requirements announced by the Court in *Morrissey* are still good law." *Id.* at 259. In short, the "current confrontation jurisprudence in the context of providing due process in a non-trial proceeding involving a liberty interest" (to use the majority's language) is that *Crawford* does not apply.[17]

Contrary to the majority's assertions, *Crawford* is neither a "guide" nor a "jurisprudential sea change." "Nothing in *Crawford,* which reviewed a criminal trial, purported to alter the standards set by *Morrissey* ... or otherwise suggested that the Confrontation Clause principle enunciated in *Crawford* is applicable to probation revocation proceedings." *United States v. Aspinall,* 389 F.3d 332, 343 (2d Cir.2004). There is "no basis in *Crawford* or elsewhere to extend the Sixth Amendment right of confrontation to supervised release proceedings." *United States v. Hall,* 419 F.3d 980, 985–86 (9th Cir.2005).

In *Curtis,* the court considered in the revocation context both the applicability of *Crawford* and whether to apply the reliability test or the balancing test. Regarding the *Crawford* challenge, the court simply held that case did not apply, noting "[a]ll the circuit courts that have expressly considered this

its conclusion that was never analyzed. While the majority obviously wants *Crawford* to apply, this is simply not the case, and the majority should not attempt to conceal its application of it.

**17.** In the sentencing context, the Fourth Circuit recently wrote:

Recent Confrontation Clause decisions do not require us to reconsider this settled distinction between trial evidence and sentencing evidence in the hearsay context. In a line of cases beginning with *Crawford* ... the Supreme Court has held that the Confrontation Clause generally bars the use of testimonial hearsay at trial unless the declarant is not available to testify and the defendant had a prior opportunity to cross-examine him. But nothing in these cases states that the confrontation right applies at sentencing; indeed, they suggest precisely the opposite.

*United States v. Powell,* No. 09–4012, 650 F.3d 388, 2011 WL 1797893, at *3 (4th Cir. May 12, 2011) (citations omitted).

issue agree." 626 F.3d at 544. The court then considered whether to apply the reliability or balancing test. Although the court ultimately found it unnecessary to decide which test to use since the disputed testimony was admissible under either, it notably in its analysis of both tests did not mention *Crawford*. *Id.* at 545–46. That was because *Crawford* simply did not apply. *Id.* at 544.

Likewise, in *Reyes,* the court in considering whether to apply the reliability or balancing test stated: "Because probation revocation hearings are not criminal trials, the United States Supreme Court's decision on the Sixth Amendment right to confrontation in criminal trials is not implicated or discussed here." 868 N.E.2d at 440 n. 1. The court went on to adopt the reliability test without further mention of *Crawford.*

*Crawford* may be said to have limited application to probation revocation proceedings. Since the due process right to confrontation is more limited than the Sixth Amendment right and *Crawford* says the Sixth Amendment right applies only to testimonial hearsay, then the due process right must also only apply to testimonial hearsay. *Dickens,* 52 Va.App. at 418, 663 S.E.2d at 551. However, *Crawford* did not alter the due process test for denying confrontation, whether that is the reliability or balancing test. Case law on the subject is unanimous.

Thus, I find it difficult to fathom how *Crawford* may serve as a guide or have the enormous importance the majority attaches to it. *Crawford* simply does not apply here.

## V. OTHER COURTS' APPLICATION OF RELIABILITY STANDARD

Before proceeding to analyze the facts of this case under the reliability standard, it is useful to consider how other courts have applied the reliability standard under similar facts.

In *Crawford,* 323 F.3d at 124, the court affirmed a parole revocation based solely on a police investigative report. A woman's complaint led to Crawford's arrest for aggravated assault. *Id.* At a parole revocation hearing, a single police

report of the incident (also relating drug use by Crawford) was admitted and parole was revoked based on it. *Id.* at 124–25. On appeal, Crawford raised similar arguments as in this case, challenging the "exclusive reliance on the police investigative report . . . inasmuch as it is unsworn, prepared months after relevant events, and apparently consisted not of the author's personal observations or conversations with the complainant but instead was a summary of an affidavit prepared by another police officer." *Id.* at 127. Crawford also noted that the assault charge was never prosecuted and his arrest record was expunged. *Id.* at 127–28.

In spite of the minimal amount of evidence and that Crawford was never prosecuted, the court found the police report sufficiently reliable to revoke parole. Enunciating the reliability standard, the court stated that hearsay evidence could be relied upon where it possessed "sufficient indicia of reliability under the circumstances at hand to protect the prisoner's due process rights." *Id.* at 129. First, the court noted the report was "quite detailed, an indicia of reliability." *Id.* at 130. Second, the court found important that Crawford did not dispute a large portion of the relevant facts. *Id.* Third, the court stated the report contained internal corroboration by including information from sources other than the complainant. *Id.* A responding officer observed evidence inconsistent with Crawford's story and Crawford's "far-fetched explanation" gave "reasonable cause for the Board to doubt his denial of culpability." *Id.* Fourth, Crawford failed to present any evidence contesting his guilt. *Id.* Finally, claimed multiple levels of hearsay were not significant under the facts of the case. *Id.* at 130–31.

Another case demonstrating application of the reliability standard is *United States v. Kelley,* 446 F.3d 688 (7th Cir. 2006). There an officer responded to a scene for a report about a person with a gun. *Id.* at 689. The victims told the officer Kelley had punched them and displayed a rifle he retrieved from the trunk of his car. *Id.* at 690. The officer observed that one of the victims had a broken tooth. *Id.* Later, the officer searched Kelley's vehicle and discovered a rifle. *Id.*

Although the officer lacked personal knowledge of the incident related by the victims, he testified about their account at a revocation hearing and the court found Kelley in violation of his supervised release. *Id.* On appeal, Kelley argued the trial court erred in admitting the victims' hearsay statements. *Id.* at 692. Applying the reliability standard, the court affirmed, holding the victims' hearsay "bore substantial indicia of reliability" since "[t]he physical evidence and the officer's personal observations and investigation corroborated the [victims'] accusations." *Id.*

## VI. APPLICATION OF RELIABILITY STANDARD IN THIS CASE

I believe the hearsay testimony of Detective Ortiz concerning the two incidents was sufficiently reliable for admission. Each incident will be discussed in turn.

### *Attempted Robbery Incident*

The first way this incident possesses reliability is that it contains a detailed account given to Detective Ortiz. *Lloyd,* 566 F.3d at 345; *Crawford,* 323 F.3d at 130; *Egerstaffer,* 726 F.2d at 1235. Ortiz spoke to both the victim and his daughter. The victim related how he received a phone call from an unfamiliar number. The caller pretended to be from the sheriff's office and requested the victim to go to the office to sign documents about a family member. When the victim did not immediately exit, the caller phoned him again. Upon leaving, a man approached the victim and asked for a cigarette. The man then attempted to take a bag from the victim, but was unsuccessful as the victim resisted. The victim reported the incident to the police. He subsequently received more calls purporting to be from the sheriff's office. When his daughter requested to see the number, she realized it was the phone number for Henderson. The victim and his daughter spoke with Henderson, who told them "he lends his phone to a lot of people" and he did not "remember who he loaned it to that day."

Second, Henderson's story corroborated what the victim and his daughter reported. *Crawford,* 323 F.3d at 130; *McCallum,* 677 F.2d at 1026. Detective Ortiz spoke with Henderson about this incident, and Henderson related "basically the same thing" as he had told the victim and his daughter. During another interview, Henderson stated "that his phone was stolen and miraculously it appeared on his porch two days later." While these statements do not corroborate the remainder of the story of the victim and his daughter, "[n]ot every detail . . . need be corroborated to establish the reliability." *Cf. United States v. Farmer,* 567 F.3d 343, 348 (8th Cir.2009).

Third, Henderson's statements gave ample cause to doubt his credibility and believe his culpability. *Crawford,* 323 F.3d at 130; *see also Covil v. Commonwealth,* 268 Va. 692, 696, 604 S.E.2d 79, 82 (2004) ("A false or evasive account is a circumstance, similar to flight from a crime scene, that a fact-finder may properly consider as evidence of guilty knowledge."). Henderson recounted different stories regarding his involvement. He told the victim and Ortiz he had loaned his phone on the day in question, but did not remember who borrowed it. At another time, Henderson told Ortiz someone had stolen his phone, but it incredibly "appeared on his porch two days later." The inconsistencies in Henderson's accounts and especially his story about his magically disappearing/reappearing phone provided "reasonable cause . . . to doubt his denial of culpability." *Crawford,* 323 F.3d at 130.

Fourth, Henderson failed to present any evidence to contradict the Commonwealth's evidence. *Crawford,* 323 F.3d at 130 (finding important that "despite the obvious incentive to present supporting evidence, [the defendant] did not call any witness or present evidence other than his own testimony to support his version of events"); *United States v. Waters,* 158 F.3d 933, 941 (6th Cir.1998) (finding relevant that while the defendant argued his inability to cross-examine a hearsay declarant prevented the defendant from establishing his brother participated in illegal conduct, the defendant "presented no evidence suggesting that his brother rather than he initiated

contact"); *see also United States v. Minnitt,* 617 F.3d 327, 334 (5th Cir.2010) (noting in finding reliability that the defendant "failed to offer any evidence").[18] Henderson knew the identities of the victim and his daughter. *Crawford,* 323 F.3d at 130. He knew of the allegations since Ortiz contacted him. Yet he failed to present any contrary evidence. Rather, Henderson admitted another person could have used his phone to attempt the robbery.

Fifth, it is notable that Ortiz spoke with the victim and his daughter soon after the incident. In fact, the victim and his daughter had already reported the incident to police officers. Their quick report supports reliability. *Cf. Herron v. Commonwealth,* 208 Va. 326, 330, 157 S.E.2d 195, 198 (1967).

Finally, the victim and his daughter would be subject to criminal liability if they made a false report to the police. Code § 18.2–461. This increases their reliability. *See Beckner v. Commonwealth,* 15 Va.App. 533, 535, 425 S.E.2d 530, 532 (1993).

The majority's cursory analysis of the factual reliability of this incident diminishes towards exclusion the significance of the facts described above. Moreover, while the majority apparently believes four days between the attempted robbery and the interview with Ortiz represents a long period of time for the witnesses' memories to diminish, that period enhances reliability. *See Page v. Clopton,* 71 Va. (30 Gratt.) 415, 430 (1878) (holding that after a period of five days "the facts were no doubt firmly impressed on his mind and fresh in his recollection"); *see also People v. Androvett,* 135 A.D.2d 640, 522 N.Y.S.2d 218, 220–21 (N.Y.App.Div.1987) ("The lineup was conducted within four days of the crime while the witness's memory was still fresh. . . ."); *Jackson v. State,* 338 So.2d 231,

---

**18.** Contrary to the majority's position, I do not contend Henderson had any obligation to present evidence. The burden was on the Commonwealth to prove the reliability of the evidence. A failure to present evidence by Henderson would obviously not suffice to prove reliability. However, case law makes clear such a failure may be considered as a factor tending to bolster reliability. The majority does not address this case law.

232 (Fla.Dist.Ct.App.1976) ("In view of the fact that the victim herein observed her assailant ... only nine days later while her memory was still fresh, there is little room for doubt that the identification of the defendant was correct."). The majority also finds persuasive that a large portion of the victims' statements did not concern Henderson. In fact, that the victims limited their statements concerning Henderson tends to enhance their credibility since it shows they did not deliberately structure their statements to implicate Henderson. *Cf. Monroy v. City of Los Angeles*, 164 Cal.App.4th 248, 78 Cal.Rptr.3d 738, 753 (2008) (stating that "credibility may be enhanced when a defense expert agrees with a plaintiff's expert").[19]

---

19. Assuming a balancing test is the applicable test, I would likewise hold the challenged testimony of this incident admissible, in accord with the following analysis.

Under the balancing test, a court evaluates whether the government's interest in denying confrontation outweighs a defendant's interest in confronting a witness. *Barnes v. Johnson*, 184 F.3d 451, 454 (5th Cir.1999). Reliability constitutes "a principal factor" in this analysis. *Lloyd*, 566 F.3d at 345.

"Whether a particular reason is sufficient cause to outweigh the right to confrontation will depend on the strength of the reason in relation to the significance of the releasee's right." *United States v. Comito*, 177 F.3d 1166, 1172 (9th Cir.1999). "Courts have recognized that a declarant's refusal to testify or threats made against a declarant may be good cause for his absence and justify the admission of hearsay." *Lloyd*, 566 F.3d at 346. Where it is clear that a witness is unavailable, a court applying the balancing test should simply determine whether the evidence is reliable. *Farmer*, 567 F.3d at 347.

In considering whether the government had shown adequate reasons for not producing the victims of this incident to testify, persuasive are Henderson's admissions corroborating the victims' accounts and the fear of retribution for testifying.

In *Bell*, 785 F.2d at 644, the court held admission of police reports proper without the officers' presence where the defendant partially corroborated the reports. The police reports detailed an occasion where police arrested Bell for driving while intoxicated, possessing marijuana, and possessing narcotic paraphernalia. *Id.* at 642. Bell admitted "that he was driving on a public highway in the middle of the night without his lights on, and that he had been drinking." *Id.* at 644. While acknowledging that drinking does not establish intoxication, the court found this corroboration sufficient to justify admitting the police reports without confrontation. *Id.* The court held that in light of "all of these reports and ... the force of Bell's own concessions, we are morally certain that no substantial purpose would have been served by requiring the officers' personal presence." *Id.* The court continued by

*Home Invasion Robbery*

Regarding the second incident, the victim told Ortiz that several men came to his door at night and knocked on the

---

stating that the officers "would simply have repeated what is in the reports, and none of the contentions made by Bell at his revocation hearing indicates that he would have been able to shake their account in any substantial way." *Id.* This was also in spite of the fact that Bell apparently made no admissions concerning his arrest for drugs. *Id.*

In *United States v. Jones*, 299 F.3d 103 (2d Cir.2002), the court held it proper to consider fear or risk of retaliation under circumstances relevant to this case. Jones was on supervised release after having been convicted of partaking in a racketeering enterprise. *Id.* at 105. Through hearsay testimony of an officer, the government presented evidence that Jones had been standing in the doorway of an apartment building while masturbating and making sexual remarks to a fifteen-year-old girl. *Id.* at 107. The hearsay declarants were the wife of the officer and the young girl. *Id.* The girl told the officer "she was scared" from the incident. *Id.* After Jones was arrested that day, he told the officer "it's not over. Okay. I'll get you." *Id.* In assessing whether the government presented sufficient reasons for denying confrontation, the court found "with regard to both eyewitnesses, Jones's history of violent conduct made reprisal against them a possibility." *Id.* at 113.

With respect to this incident, Henderson's admissions alone justified the admission of hearsay. The only part of the hearsay concerning Henderson was the use of his phone to set up the attempted robbery, which he admitted was possible. Although this does not corroborate the remainder of the account, it is a significant piece of evidence. Furthermore, it is unclear how Henderson would impeach the hearsay declarants or how any changes in the victims' account would affect Henderson since only his phone was involved. Under *Bell*, the corroboration provided is adequate.

Yet Henderson's corroborating statements did not represent the only basis for admission, for the potential threat to the victims also provided a ground to excuse their presence. Ortiz testified that the victim "explained to me he really didn't want to file charges because people knew his daughter, and they all were in the neighborhood, they live in the same neighborhood, they knew where he lived." Obviously, the victim was afraid of retaliation if charges went forward. Like the defendant in *Jones*, Henderson had a history of violent conduct, i.e., the robbery he committed in 2000 and the home invasion robbery from this case. This represented substantial ground to believe retaliation was possible. Moreover, the victim's daughter was familiar with Henderson. Henderson's involvement was discovered because the daughter recognized his phone number. She knew Henderson by his first name and had him come to her residence to discuss the incident. As such, it is likely she was familiar with Henderson's personality and his propensity for violence. This gives additional weight to the victim's fear.

For the reasons already discussed above, the hearsay was clearly reliable. Thus, I would hold that under the balancing test the hearsay was properly admitted.

door, but the victim did not open it because he saw who was there. The men entered the door, which was unlocked, and stole property. The first person to enter possessed a gun in his waistband. The victim identified Henderson as the second person to enter from a photo lineup prepared by Ortiz.

Unlike the first incident, the story related here is not detailed. Rather, it is simply a statement that several people knocked on the victim's door, entered without permission, and took property. It is true that a lack of detail diminishes reliability. Furthermore, the victim had several prior larceny convictions and had agreed to plead guilty to grand larceny, which again makes his story less reliable.

That said, other evidence presented significantly corroborated the victim's account to make the story reliable. *See Rondeau*, 430 F.3d at 48; *see also United States v. Pratt*, 52 F.3d 671, 675 (7th Cir.1995).

First, Henderson and an accomplice made incriminating statements about Henderson's involvement. During a police interview, Henderson admitted he knew the other perpetrators of the robbery. He also admitted he had been in a car with them. A search of the car from a warrant discovered property belonging to the victim. During a monitored telephone conversation, the gunman from the robbery said "they got me and they got [Henderson]."

Second, other monitored telephone calls plainly established the fact that the robbery occurred. It was learned that some of the victim's property was in the house of Henderson's brother. The gunman instructed the brother to remove the property. The gunman made numerous threats towards the victim. The gunman eventually arranged to return the stolen property to the victim. Although this evidence does not necessarily indicate Henderson's involvement, it proves another fact crucial to the case: the existence of a robbery involving the victim.

Third, the monitored telephone conversations provided evidence of a motive. At one point, Henderson stated the victim "pulled a knife on Martin" and the victim "should go to jail." In another conversation, the gunman, immediately after stating "they got me and they got [Henderson]" for the robbery, "asked how did they get Martin." Thus, it may be inferred that Martin was the third participant in the robbery, that Henderson shared Martin's unfavorable relationship with the victim, and that Henderson acted upon these sentiments by participating in the robbery. The robbery may have been in retaliation for the victim pulling a knife on Martin, or an act of aggression against someone the perpetrators did not like.

Fourth, Henderson provided evasive explanations to Ortiz and the court could make an incriminating inference from this. *Crawford*, 323 F.3d at 130; *Covil*, 268 Va. at 696, 604 S.E.2d at 82. Henderson first told Ortiz "that the people in the neighborhood simply didn't like him, and that's why his name came up on these two different cases." When Ortiz inquired further about why people did not like him, Henderson stated "they just don't." Henderson then mentioned the victim of the home invasion as "being one of the people that don't like him just because he had an issue with his brother." The trial court could infer a desire to conceal the truth from Henderson's implausible claim that he was identified as a robber simply because of a general dislike for him in the community. Moreover, by Henderson specifically mentioning the robbery victim as a person who disliked him, the trial court could infer Henderson's involvement in the robbery and a desire to discredit the victim.

Fifth, the court could again make an incriminating inference from Henderson's statements regarding his whereabouts the night of the robbery. Henderson told Ortiz that on the night of the incident, he was on his porch talking with others between 8:00 p.m. and midnight. Yet at the hearing, Henderson presented the testimony of his mother, who stated that when she arrived home at 10:20 p.m., Henderson was in his room and did not leave the house that night. Furthermore, when police searched Henderson's house, they were told

that Henderson "was not there the day of the incident." The court could choose to believe that Henderson and his mother were seeking to conceal his guilt and regard this as additional proof of culpability.

Sixth, it is notable that the victim reported the robbery soon after it was alleged to have occurred. Ortiz testified she was called "at night at my house to come in to investigate a home invasion robbery." This tends to support reliability. *Cf. Herron*, 208 Va. at 330, 157 S.E.2d at 198.

Seventh, the victim would have been subject to criminal liability for filing a false report. Code § 18.2–461. This increases a complainant's reliability by attaching a penalty to misleading police. *See Beckner*, 15 Va.App. at 535, 425 S.E.2d at 532.

Finally, the police obtained an arrest warrant for Henderson because of the robbery. Thus, a judicial officer found the evidence sufficiently reliable to establish probable cause for an arrest. The charge was eventually *nolle prosequied* because the victim, who was scared of retaliation, refused to testify.

Yet again, the majority's terse analysis ignores the many relevant factors described above. The majority focuses only on the evidence favorable to Henderson.

Taken together, the evidence revealed a reliable account of a robbery involving Henderson. While the victim's story standing alone would not support a reliability finding, the other evidence, including statements by Henderson, provided a reliable history.[20]

---

**20.** Once again, assuming a balancing test applies, I would hold the hearsay admissible. Under facts and arguments extremely similar to this incident, the court in *Martin* held the hearsay was admissible. The court held:

> In the present case, Martin argues that the government has failed to adequately explain its failure to present Garcia's live testimony. Martin points out that, although Sperando did testify regarding Garcia's refusal to testify against Martin in state court, those state court proceedings occurred more than a year before the revocation hearing and yet, since those state court proceedings, the government

had made no attempt to interview or subpoena Garcia. Moreover, Martin contends, there has been no showing that Garcia's alleged reason for refusing to testify (i.e., her fear of retaliation by a "crime family") is well-founded. Consequently, Martin argues, the government has failed to show that the burden of producing Garcia's live testimony is inordinate.

\* \* \* \* \* \* \*

In the present case, the government did offer an explanation for why the burden of producing Garcia as a live witness would be inordinate. The government presented evidence that Garcia repeatedly stated that she would not testify against Martin and that, when Garcia was subpoenaed to testify against Martin in state court, she appeared in court but refused to testify. The government believed that Garcia likewise would not testify against Martin at his supervised release revocation hearing and that serving her with a subpoena would be futile. The government also demonstrated that the hearsay evidence was reliable. . . .

[W]e hold that the government met its burden to show good cause for not producing Garcia as a live witness at the revocation hearing. 382 F.3d at 845–46 (citation omitted).

Like *Martin*, the Commonwealth plainly demonstrated here that the victim refused to testify from fear of retaliation. The following dialogue occurred during the hearing:

[Prosecutor]: Would it be fair to say ultimately, Detective .Ortiz, that the victim . . . refused to come to court and to testify to the circumstances of the home invasion?

[Ortiz]: Yes. I actually personally met with him and his mother, and they were extremely scared of retaliation. My victim's mother . . . she basically said she—the day before the court she heard gunshots around the house, and that really scared her.

A charge was filed against Henderson in connection with the robbery, but was *nolle prosequied* when the victim refused to testify. Such fear was justified, for Ortiz testified that in monitored phone conversations the gunman made "a lot of threats towards the victim."

Based on this evidence, the Commonwealth showed the victim refused to testify from fear of Henderson or his accomplices. Considering that in a previous proceeding the Commonwealth was forced to *nolle prosequi* a charge because of the victim's refusal to testify, there is no reason to believe a different result would occur at a revocation hearing. *Id.* at 846. As such, the only inquiry was whether the evidence was reliable. *Farmer*, 567 F.3d at 347. For the reasons detailed above, it was reliable.

Contrary to the majority's assertion, it is not a fair reading of the record to suppose the only reason the victim was afraid was from hearing gunshots. This ignores the gunman's threats towards the victim, as well as the likelihood that the victim, who apparently associated with persons like Henderson, was well aware of the possibility of retaliation. The gunshots merely reinforced an already present fear.

I note that for both incidents, most of the hearsay was not multi-layered, but consisted of testimony of Ortiz of events described to her by others. Exceptions may be found, but they are not of significance in light of the other evidence.

Finally, I note that in its conclusion section, the majority holds that "in this case the circuit court did not apply either test in overruling Henderson's objection to Ortiz's testimony. Thus, the record before us fails to establish 'good cause'...." This could be interpreted to mean a trial court must make an explicit finding of good cause on the record. This would be an issue not raised at trial, in Henderson's opening brief, or in the majority's analysis section.

## VII. CONCLUSION

I conclude that Virginia has adopted a reliability test to determine the admissibility of hearsay in revocation hearings and that application of that test permits the introduction of the testimony here challenged. Accordingly, I would affirm the trial court.

---

Moreover, even if the victim's fear was irrational, this is irrelevant since the evidence is clear he refused to testify. *Martin*, 382 F.3d at 846.